<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -
    BELCHER PHARMACEUTICALS, LLC,
 4                                    :    CIVIL ACTION
            Plaintiff,               :
 5                                   :
               v.                    :
 6                                   :
    HOSPIRA INC.,                    :
 7                                   :    NO. 17-775-LPS
            Defendant.
 8                             - - -

 9                    Wilmington, Delaware
                  Thursday, December 20, 2018
10                   Telephone Conference

11                             - - -

12  BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

13                             - - -
    APPEARANCES:
14

15
            BAYARD, P.A.
16          BY:  STEPHEN B. BRAUERMAN, ESQ.

17              and

18          GrayROBINSON, P.A.
            BY:  STEFAN V. STEIN, ESQ.,
19               COLE CARLSON, ESQ., and
                 WILLIAM V. STEIN, ESQ.
20              (Tampa, Florida)

21                    Counsel for Plaintiff

22

23

24                         Brian P. Gaffigan
                           Registered Merit Reporter
25
</pre>

1   APPEARANCES:   (Continued)

2

3                      PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
                       BY:   JOHN C. PHILLIPS, JR., ESQ.

4                          and

5                      WILLKIE FARR & GALLAGHER, LLP
                       BY:   MATTHEW FREIMUTH, ESQ.,
6                            DEVON W. EDWARDS, ESQ., and
                             RONALD A. LEE, ESQ.
7                            (New York, New York)

8                             Counsel for Defendants

9

10

11

12

13

14                                 - oOo -

15                        P R O C E E D I N G S

16              (REPORTER'S NOTE:   The following telephone

17   conference was held in chambers, beginning at 11:05 a.m.)

18              THE COURT:   Good morning, everybody.   This is

19   Judge Stark.   Who is there, please?

20              MR. BRAUERMAN:   Good morning, Your Honor.   This

21   is Steve Brauerman from Bayard.   I'm joined on the line by

22   Stefan Stein, Cole Carlson, and William Stein from Gray

23   Robinson on behalf of the plaintiff.

24              THE COURT:   Okay.

25              MR. PHILLIPS:   Good morning, Your Honor.   This

1    is Jack Phillips from Phillips Goldman on behalf of Hospira;

2    and with me on the line are Matt Freimuth, Devon Edwards,

3    and Ron Lee of Willkie Farr.  And I believe Mr. Freimuth

4    will address the Court.

5                    THE COURT:  Okay.

6                    MR. FREIMUTH:  Good morning, Your Honor.

7                    THE COURT:  Good morning.  And I have my court

8    reporter here and for the record, it is our case of Belcher

9    Pharmaceuticals LLC v Hospira Inc., Civil Action No.

10   17-775-LPS.  And we set this time to talk about a dispute

11   over a provision in the protective order.  We got the letter

12   first from Hospira so let's hear from Hospira first.

13                    MR. FREIMUTH:  Good morning, Your Honor.  This

14   is Matthew Freimuth from Willkie Farr.

15                    The issue before the Court today as we see it,

16   is the extent to which Dr. Mike Bauer, who is Hospira's

17   in-house counsel, should have access to the discovery record

18   or I should say confidential portions of the discovery

19   record in this case.  And for the reasons set forth in our

20   letter, Your Honor, we submit that Dr. Bauer should have

21   full access to materials designated pursuant to the

22   protective order here.

23                    The question before of the Court is the

24   extent to which Mr. Bauer -- or Dr. Bauer I should say is

25   a competitive decisionmaker.  And we submit based on the

1    declaration of Dr. Bauer that we provided to the Court, he

2    is not a competitive decisionmaker.  His role is to manage

3    Hospira's portfolio of patent litigation.  He supervises and

4    advises outside counsel.  He has been, and continues to be,

5    an integral part of the litigation team handling this matter.

6           As an attorney, Dr. Bauer is subject to the

7    same ethical responsibilities as I am as outside counsel.

8    He has served an in-house counsel for Hospira in dozens of

9    litigations and has had access to confidential discovery

10    material in those cases.  He knows how to handle it, how

11    to avoid inadvertent disclosure, and he has agreed, as is

12    set forth in the declaration, that he will use any discovery

13    material that he has access to only for purposes of this

14    case and will not disclose it to anyone outside of the

15    protective order.

16           It is also relevant to consider what Dr.

17    Bauer does not do.  He is not engaged in any competitive

18    decision-making for Hospira.  He is not an officer of the

19    company.  He is not on the board.  He has no business

20    decision making responsibilities.  He is not involved was

21    sales, marketing, pricing or R&D.  He is not involved with

22    the patent prosecution.

23           And on these facts we submit, Your Honor, the

24    Court should enter a protective order that permits Dr. Bauer

25    access to any material designated confidential under it.

1            With that in mind, we think that a two-tier

2  order is not warranted in this case, as Dr. Bauer should be

3  permitted full access.  That is really the extent of our

4  position.  And I'm happy to address any questions the Court

5  has.

6            THE COURT:  All right.  So, first off, if I

7  accepted your position, what would the impact be as you

8  understand it for Belcher?  And so, that is, the result

9  would be you would have Dr. Bauer with full access, and who

10  would have access on Belcher's side from your understanding?

11            MR. FREIMUTH:  I understand that Belcher does

12  not have an in-house litigation counsel.  So from Belcher's

13  perspective, their outside counsel would be able to access

14  discovery information and certainly confidential discovery

15  information and certainly any outside experts or consultants

16  that they retained to look at confidential discovery

17  information.  What they would not be able to do is share

18  sensitive Hospira business information with any employees

19  of Belcher who have competitive decision-making authority.

20            THE COURT:  Are you open to them designating one

21  person who is a non-lawyer employee that would have the same

22  access that you are seeking for Dr. Bauer?

23            MR. FREIMUTH:  The only person that has come up

24  in discussions with Belcher over who such a person might be

25  is Darren Rubin.  And this was in discussions we had

1     previously.  Mr. Rubin, as we understand it, is the

2     company's Chief Science Officer.  He has responsibilities,

3     some responsibility for R&D at Belcher.  He is a C Suite

4     executive as we understand it.  And he is not a person that

5     we would be comfortable with sharing any sensitive Hospira

6     R&D documents with.

7               THE COURT:  Because?

8               MR. FREIMUTH:  Because presumably of the

9     extent to which an individual like that, with competitive

10    decision-making authority, could use that material to some

11    competitive advantage for Belcher.

12              THE COURT:  All right.  What about the argument

13    which is based on I think an undisputed fact that Dr. Bauer

14    actually doesn't even work for Hospira, he works now for

15    Pfizer?

16              MR. FREIMUTH:  The inquiry here, the extent to

17    which Dr. Bauer is a competitive decisionmaker and whether

18    he is, as a technical matter, employed by Pfizer or Hospira

19    Inc. we think is largely irrelevant to that inquiry.  It's

20    certainly the case that Dr. Bauer was a Hospira employee.

21    Hospira was acquired by Pfizer in 2015, and the Hospira

22    Legal Department and I believe most, if not all, Hospira

23    employees were essentially rolled up into Pfizer such that

24    Hospira now is a division of Pfizer, is listed in all the

25    ANDA filings as a, quote, "Pfizer company."  So we think it

1    is really a distinction that for purposes of the inquiry

2    before the Court today doesn't matter.

3            THE COURT:  Do you have a response to this

4    *Mixing Equipment* case cited by the plaintiff in which that

5    court seemed to see it differently and said your argument

6    wrongly ignores the legal distinction between corporate

7    entities?

8            MR. FREIMUTH:  I do, Your Honor.  The difference

9    in -- *Mixing Equipment* was a slightly different posture in

10   which a protective order in that case was already in place.

11   The parties had agreed to it.  And then after the fact,

12   the court had to determine whether a lawyer for the parent

13   company fit within the definition of "in-house counsel to a

14   party" as that term had been agreed to and implemented by

15   the protective order that was already in place.

16           Here, it is a slightly different issue.  You

17   know, the question of whether Mr. Bauer or Dr. Bauer is a

18   competitive decisionmaker is sort of squarely before the

19   Court prior to the entry of an order, and we think that

20   the posture is different between the two cases.

21           THE COURT:  Is there anything in the record

22   about this Mr. Zielinski, to whom evidently Dr. Bauer

23   reports and whether he, that is, his superior is a

24   competitive decisionmaker?  And would that matter?

25           MR. FREIMUTH:  What is in the record about

1    Mr. Zielinski is reflected in paragraph 2 of Dr. Bauer's

2    declaration which states that Mr. Zielinski is not a

3    businessperson and does not have direct responsibility over

4    competitive decision-making.

5            Mr. Zielinski's role is largely irrelevant to

6    the question before the Court.  Really what we're asking

7    Your Honor to evaluate is the extent to which Dr. Bauer is a

8    competitive decisionmaker and for the reasons that I have

9    said he is not.

10           Dr. Bauer acknowledges that if the protective

11   order we have asked for is entered, and he gets access to

12   confidential Belcher information under the protective order,

13   he can't share that information with Mr. Zielinski in any

14   event.

15           To the extent that what Mr. Zielinski's role

16   is relevant at all, it is really to give Your Honor comfort

17   that the risk of inadvertent disclosure here is minimal

18   given that Mr. Bauer has one direct reporting line and

19   even that person doesn't have competitive decision-making

20   authority.

21           THE COURT:  Do you oppose a two-tier system if

22   Dr. Bauer is permitted to review both tiers of material?

23           MR. FREIMUTH:  I do think that in this

24   particular case, a two-tier order -- obviously, we think it

25   is a good thing if Dr. Bauer were able to review a first and

1    second tier.  I don't think this is a case that warrants a

2    two-tier order primarily because at least from Hospira's

3    perspective, the nature of what has been requested and what

4    we intend to produce is largely communications with the

5    FDA, R&D documents, documents related to our manufacturing

6    protocols, testing, things like that, all of which would

7    be of such a sensitive nature that they would likely, to the

8    extent confidential material was produced, it would be

9    material that we would expect would be kept in a top tier.

10   So in the context of this particular case, we just don't

11   think it's necessarily warranted.

12              THE COURT:  Okay.  Thank you very much.  We'll

13   hear from Belcher now.

14              MR. CARLSON:  Thank you, Your Honor.  This is

15   Cole Carlson from Gray Robinson on behalf of Belcher

16   Pharmaceuticals.

17              I want to start off by saying that we're not

18   saying Mr. Bauer can't access any documents in our proposed

19   order.  The first tier, the confidential tier, Mr. Bauer

20   would have full access to it.  And, furthermore, in terms of

21   litigation logistics and strategy, Hospira would still have

22   the ability to consult with their expert on AEO documents

23   relating to research and development as it relates to their

24   defenses of noninfringement, invalidity and such.

25              As it relates to Dr. Bauer, I mean the language

1  of their proposed protective order is pretty clear.  "A

2  party" means a party subject to this litigation, and "inside

3  counsel" means any attorney who is an employee of a party.

4         The only party to this litigation is Hospira

5  Inc. and Belcher Pharmaceuticals.  Dr. Bauer is an employee

6  of Pfizer.  We don't think the procedural posture of *Mixing*

7  *Equipment* is particularly relevant.  The analysis is the

8  same no matter what.  You know, a corporation, they are

9  still separate legal entities and to mix the two would be a

10 disregard of that legal distinction.  So to allow Dr. Bauer,

11 under Hospira's proposed order, to be the individual with

12 access would be tantamount to a violation of the order out

13 of the gate.

14        And Hospira cites to *U.S. Steel* as the basis

15 for all this, which is the baseline for these protective

16 orders where serving as in-house counsel can't serve as a

17 sole reason to deny party access to information deemed

18 confidential and the inquiry directed to inadvertent

19 disclosure.

20        Well, here, Dr. Bauer reports directly to Dr.

21 Zielinski.  We don't know anything really about Dr. Zielinski

22 beyond Dr. Bauer's knowledge of what Mr. Zielinski does.

23 We don't have a declaration from Mr. Zielinski; and Mr.

24 Zielinski, as reported by Dr. Bauer, is only, is also only

25 employed by Pfizer.  He is the Chief IP Counsel of Pfizer

1    Essential Health.  As Chief IP Counsel, one would have to

2    assume that he is a manager of patent litigation, patent

3    enforcement, patent prosecution, a whole number of

4    decision-making responsibilities that would directly impact

5    the competitor of Belcher which is Pfizer.  And so the

6    inclusion of Dr. Bauer is objectionable on that basis alone.

7              With regard to the two-tiered aspect of the

8    proposed protective order from Hospira, Belcher would agree

9    that a large trunk will likely be AEO, but that does not

10   mean everything will be attorneys' eyes only under Belcher's

11   proposed agreement.  There are a number of confidential

12   documents that would be labeled as confidential based on the

13   request Belcher has received from Hospira already.

14             For example, communications that Belcher has

15   with third parties about the patent.

16             Communications with the FDA that don't really

17   involve formulations or anything like that.

18             Internal communications regarding patentability,

19   enforceability, prosecution, the conception of the matter,

20   the first use.  And the list goes on.

21             So labeling this as a case that doesn't really

22   require two tiers isn't entirely accurate because there are

23   a number of documents that Mr. Bauer could look at that

24   would, he would be able to assist Hospira on in mounting its

25   defense.

1          So with that, I am open to any questions from

2     the Court.

3          THE COURT:  All right.  So let's talk about this

4     situation where Dr. Bauer is an employee of Pfizer and not of

5     Hospira, the party to the case.  I'm trying to understand why

6     that really has any relevance to the dispute before me.  Why

7     shouldn't I think of him as essentially analogous perhaps

8     to outside counsel, if you are right, as a legal matter, he

9     doesn't really work for Hospira, he works for Pfizer, so he

10    is analogous to outside counsel and the question just really

11    becomes is he a competitive decisionmaker or not, which is its

12    own question.  Why shouldn't I look at it that way?

13         MR. CARLSON:  Well, first, from the agreement

14    point of view, outside counsel is actually defined as an

15    attorney from a law firm that has had at least one attorney

16    appear as counsel of record for a party and who is not an

17    employee of a party or the affiliate of a party.  So for out

18    of the gate, Dr. Bauer would be disqualified from that.

19         But to view him as analogous to outside counsel

20    would still risk inadvertent disclosure because there is

21    other pending litigation between the parties unrelated to

22    the patent infringement matter but which are involving

23    business decisions between the two parties.

24         The name of that case is actually Belcher

25    Pharmaceuticals LLC v Hospira Inc.  That is down here in the

1   Middle District of Florida.  It is case 17cv2353.  And the

2   main gist of that case is unfair competition as it relates

3   to related products.

4           So the danger here in viewing Dr. Bauer as

5   analogous to outside counsel is the risk of disclosure of

6   highly confidential documents, and, as in this case, we

7   argue highly, highly confidential documents because we're

8   dealing with scientific formulations and the background

9   to each of the research involved and all that, to allow

10  Dr. Bauer access to that would result in potential

11  disclosure in the other case as well without other further

12  assurances from Hospira which are included in Belcher's

13  proposed order.  Dr. Bauer would have access to the

14  confidential information, and part of that is an agreement

15  stating that he would not use the material in any other

16  manner.

17          The ADL material, he would be disqualified from

18  and wouldn't be able to view it purely because of the risk

19  of inadvertent disclosure in the other case.

20          THE COURT:  All right.  That is a lot of

21  different things there.  Let's try and unpack it.

22          First, I'm really trying to focus on what is

23  the additional risk or the logic in addition to risk, if

24  it's something else, to the fact that he is nominally

25  employed by Pfizer as opposed to Hospira?

1          MR. CARLSON:  Then the nominal difference we

2    view as important because Hospira and Pfizer are two

3    separate entities.  The fact that Hospira is wholly owned by

4    Pfizer is irrelevant.  The Supreme Court has said that being

5    a wholly owned subsidiary, they share a common purpose and

6    the parent can assert full control at any moment as a

7    subsidiary failed to act in the parents best interest.

8          That means that Pfizer, assuming that Dr. Bauer

9    is named as Hospira's representative in this, in-house

10   counsel representative, could assert its might over Hospira

11   and potentially act in Pfizer's interest as opposed to

12   Hospira's interest which would be to follow the protective

13   order.  So the nominal difference between Hospira and Pfizer

14   is very relevant.

15          THE COURT:  I'm not understanding.  Why, if he

16   was in-house counsel for Hospira and Hospira's parent is

17   Pfizer, couldn't Pfizer exercise that same power as well?

18          MR. CARLSON:  Maybe I'm not understanding your

19   question then.  What I'm hearing is that if Dr. Bauer, as an

20   employee of Hospira, were to have access to these documents,

21   Pfizer could then come in and say I would like to see these

22   documents, too.  But Pfizer is not a party to this agreement

23   and so Pfizer would not be bound by any provisions in this

24   order.

25          THE COURT:  Right.  But either way, Dr. Bauer is

1     bound to the agreement regardless of who his employer is;

2     right?

3                 MR. CARLSON:  That's correct.  But he still

4     discusses matters with Mr. Zielinski.

5                 THE COURT:  I guess maybe that is the way to ask

6     the question.  Is there some greater risk you can articulate

7     that Dr. Bauer is going to intentionally or inadvertently

8     breach his obligations under this agreement due to the fact

9     that he is nominally employed by the parent Pfizer instead

10    of by the subsidiary party to the litigation, Hospira?

11                MR. CARLSON:  I guess the answer to that is no if

12    he were to agree to be bound by the terms of the agreement,

13    as provided for in the protective order.

14                THE COURT:  Is it somehow that -- and I

15    appreciate that you have acknowledged you are not seeing

16    it's a greater risk that he will violate given who his

17    employer is.  Is it maybe the damage could somehow

18    foreseeably be worse if he violated his obligations in,

19    and he violated it and he is part of a big international

20    conglomerate, Pfizer as opposed to a smaller company,

21    Hospira?  Is that part of the issue?

22                MR. CARLSON:  That is part of the issue.  So

23    Dr. Bauer and Mr. Zielinski are heavily involved in patent

24    litigation relating to Hospira and Pfizer's drug

25    applications as well as regulatory inquiries implicating

1    intellectual property issues.

2              In paragraph 3 of his declaration, Dr. Bauer

3    states he conducts patent evaluation and analysis and

4    supervises outside counsel in connection with patent

5    litigation.

6              Judge Burke recently, as of last year, in the

7    *Fish v Wombat Security Technologies* case stated that a

8    significant active role in the direction patent litigation

9    and licensing weighs in favor that in-house counsel actually

10   participates in competitive decision-making.

11             So the damage here would be that Dr. Bauer and

12   Mr. Zielinski, assuming Dr. Bauer discloses something to

13   Mr. Zielinski, could use that information for one of

14   Pfizer's drug applications.  Now, Pfizer is a competitor of

15   Belcher and so Pfizer's drug application would have a direct

16   impact on Belcher and its financial well-being.

17             THE COURT:  Are you saying Hospira is not a

18   competitor of Belcher?

19             MR. CARLSON:  Well, Hospira is a competitor as

20   well.  But the fact that Dr. Bauer and Mr. Zielinski have

21   titles with Pfizer and have responsibilities to Pfizer mean

22   that any potential issues that crop up would inure to the

23   benefit of -- potentially inure to the benefit of Pfizer as

24   opposed to Hospira, and that would damage Belcher.

25             THE COURT:  All right.  Let's talk about the

1    impact on Belcher.

2            First off, is there someone that you are

3    considering that, whether I have a one-tier or two-tier

4    designation, that you think should have access to everything

5    who is in-house at Belcher?

6            MR. CARLSON:  Yes.  As Mr. Freimuth stated, that

7    would be Darren Rubin.  He is the Chief Science Officer.  We

8    would have Mr. Rubin sign the agreement stating he would not

9    use any of the information for any other purpose besides the

10    litigation, to provide analysis for on behalf of outside

11    counsel and all that.  And so there is no -- assuming that

12    he signs the agreement, he would be bound by the protective

13    order, and there would be a reduction in the potential of

14    inadvertent disclosure.

15            THE COURT:  Well, is Mr. Rubin a competitive

16    decisionmaker in the way the law uses that term?

17            MR. CARLSON:  Well, I guess Mr. Rubin is

18    involved in patent litigation.  He is just like Dr. Bauer.

19    He is involved in managing patent litigation for Belcher.

20    He is one of the individuals that we deal with at Belcher

21    regularly with regard to this case.  He is also responsible

22    for responding to regulatory inquiries that implicate IT

23    issues.

24            So if Dr. Bauer is acceptable, then Mr. Rubin

25    should be acceptable as well.

```
 1              THE COURT:  Except the suggestion at least --
 2     and I don't think I have much, if anything, in the record
 3     about this Mr. Rubin.  But the suggestion I'm hearing from
 4     Hospira is that Mr. Rubin also actually does research and
 5     oversees research, and, therefore, it would be impossible
 6     for him to put aside what he learns about the confidential
 7     or highly confidential research activities of a competitor,
 8     Hospira.  Is that something that is either factually based
 9     or that I should be concerned with?
10              MR. CARLSON:  I will say that Mr. Rubin, I do
11     believe he is involved in some of those activities.  But I
12     also believe there are other individuals at Belcher that are
13     not involved with those activities.
14              So if there were -- you know, if we can provide
15     to Hospira an individual that is acceptable, we would be
16     open to having this one person, not a lawyer, employee have
17     the same type of access as Mr. Bauer -- or Dr. Bauer.
18     Excuse me.
19              THE COURT:  So there may be other people at
20     Belcher that you could identify as candidates?
21              MR. CARLSON:  I believe so, yes.
22              THE COURT:  All right.  Now, you make an
23     argument, I'm not sure if I have seen it before, at least
24     I don't recall it, that there may be an ethical issue here
25     in that depending on how I decide this, I might be putting
```

presumably outside counsel in a position where they're going

to breach their ethical obligations.

Again, I don't think I have heard that argument

in connection with the protective order dispute.  We have

had plenty of I think one-tier, two-tier or zero-tier

protective orders, and I certainly haven't thought that I'm

putting counsel in a position to violate their ethical

duties, and you haven't raised that argument today, but if

that is something that you think I need to consider, I'd

like to hear more about that.

MR. CARLSON:  Sure.  So as currently set with

Hospira's proposed protective order, outside counsel for

Belcher would simply have itself and its expert to consult

with, with regard to certain types of information.

The ethical rule says that we have to inform the

client of decisions and circumstances where they're informed

and consent is required.  We have to consult with clients

about how we're going to accomplish certain objectives and

keep them informed about the status of the matter.  So if we

are unable to share with the client certain information that

would require us to change the objectives that the client

may want to accomplish, then we would not be able to meet

the rule.

An example we provided in the letter was, one of

their defenses and counterclaims is the patent is invalid.

1   Part of their invalidity contentions involve portions of

2   their NDA, I believe.  I think it's part of their NDA.  If

3   not, it's confidential information, information that will be

4   deemed confidential under Hospira's protective order.

5           And so we would not be able to share that

6   information with the client.  And so we would not be able to

7   keep them informed about the matter, and we wouldn't be able

8   to make sure that what they want to get done gets done.

9           THE COURT:  All right.  Well, again, I don't

10  think I have heard that argument before.  And I have had

11  plenty of cases where there has been essentially a one-tier

12  protective order and outside counsel have somehow managed to

13  comply with their ethical obligations in a case like this.

14          I don't know exactly how they do it, but I can

15  imagine something like in your circumstance you would give

16  advice to your client about here is our assessment as to the

17  likelihood or the magnitude of the risk to the validity of

18  your patent.  Certainly, you can tell them whatever, it is

19  an obviousness defense or something like that, but you can't

20  get into all of the substantive detail of the argument, but

21  you can give them presumably your assessment as to the

22  likelihood that you are going to prevail or not prevail.

23          Again, I don't know the details of how one

24  complies with their obligations in this circumstance, but am

25  I -- are you really asking me to conclude that if I impose a

1    one-tier designation here, all the folks on the plaintiff's

2    side or outside counsel are going to be in breach of their

3    ethical obligations?

4              MR. CARLSON:  No, we're not saying that.  We're

5    saying the set up that is in Hospira's protective order

6    could prevent us from fully discussing with somebody with

7    more substantive knowledge than an outside consultant to

8    fully keep the client reasonably informed.

9              So as it is currently set up, there is outside

10   counsel, inside counsel, and then all the other people

11   like the experts and the Court that can see confidential

12   information.

13             Since Belcher has no inside counsel, that

14   provision is essentially meaningless for Belcher.  And so

15   the only people who would be able to view confidential

16   information and analyze it are outside counsel and their

17   expert.  And so it would be impossible for us to keep the

18   client reasonable informed about the status of the matter.

19             We can tell them that we, based on our

20   assessment, we think the patent is still valid or invalid,

21   but we'd essentially be keeping them in the dark about the

22   reasons why, especially with a case like this where there

23   is highly technical chemical formulas involved in terms of

24   amounts and percentages of amounts over periods of time.

25             The client, in order to keep the client informed

1    about what the best way going forward would be, is we

2    need to be able to inform them of aspects of confidential

3    information beyond just we think the patent is valid or

4    invalid.

5                    THE COURT:  All right.  Thank you very much.

6                    Let me turn back to Hospira.  Mr. Freimuth, do

7    you want to add anything?

8                    MR. FREIMUTH:  Sure.  Just a couple quick

9    points, Your Honor.

10                    With regard to the questions that you raised

11   with respect to what we view as really a technical issue of

12   who is Mr. Bauer's employer, we do think the right inquiry

13   remains whether or not he is a competitive decisionmaker or

14   not.

15                    We don't think there is any greater risk to

16   inadvertent disclosure by virtue of the fact that he is

17   technically a Pfizer employee versus technically a employee

18   of Hospira Inc.

19                    They are, for intents and purposes, Hospira is a

20   division.  Mr. Bauer has acknowledged in his declaration

21   that he doesn't and will not disclose the information to

22   anyone within Pfizer or Hospira, including Mr. Zielinski.

23   So we just simply don't believe that there is a greater

24   risk.  And to the extent that there is a technical issue

25   with the way the proposed order that we have submitted to

1    the Court defines a party, we think that that is an issue

2    that could easily be addressed before Your Honor enters the

3    order.

4             Mr. Carlson made reference to a protective order

5    in a separate case between Belcher and Hospira in Florida.

6    We note that in that case, in-house counsel is permitted

7    access to both highly confidential and confidential documents,

8    and in-house counsel includes counsel of defendant Hospira

9    or its parent Pfizer.  So we think that that is a situation

10   that could easily be addressed by the wording of the order

11   that the Court enters rather than sort of the technicality.

12            Also, with respect to Mr. Rubin, I just want to

13   point out that -- and I think Your Honor raised this point.

14   Given what I think is a clear statement that he does have

15   some competitive decision-making authority, our view is that

16   a person like that is simply not able to sort of divorce

17   from their mind the information that they've learned in the

18   context of getting access to information in discovery from

19   their competitive decision-making responsibility.  So the

20   risk of inadvertent disclosure or use, it is particularly

21   high in that circumstance, and we just don't think he is a

22   suitable person.

23            THE COURT:  All right.

24            MR. CARLSON:  Your Honor, if I may just real

25   quick.

```
 1              THE COURT:  In a minute.  I actually have a few
 2    more questions for Mr. Freimuth.
 3              So I think you are probably right in this case
 4    that the nominal party that is employing Dr. Bauer doesn't
 5    really make a difference in terms of the likelihood of a
 6    breach.  But what about this argument that if there is a
 7    breach, the resulting damage could be much greater given the
 8    wider footprint of Pfizer as an international conglomerate
 9    than if there was the same breach but Dr. Bauer was employed
10    by Hospira?
11              MR. FREIMUTH:  I just don't think there is any
12    real evidence for that other than the sort of conjecture
13    that Mr. Carlson raised.  The only entity as far as I know
14    that has submitted an NDA or ANDA for epinephrine products
15    are Hospira as a division of Pfizer.  So I don't see any
16    heightened risk based on that particularly where you have
17    somebody who is getting access to the material of a kind
18    like Dr. Bauer who has been down this road before, has been
19    outside counsel or inside counsel in 20 patent litigations
20    in the U.S. and has had access to the discovery record in
21    all of it.  He is a seasoned in-house attorney.  He
22    understands his obligations.
23              So the risk here is low regardless of whether,
24    as a technical matter, he is an employee of Hospira Inc.,
25    which I understand as a technical matter actually has no or
```

1    very few employees of its own, or, as a technical matter,

2    whether he is an employee of Pfizer.

3              THE COURT:  All right.  Are you seeking, by this

4    protective order, to permit Dr. Bauer to use what he learns

5    to help in this other litigation the parties have in

6    Florida?

7              MR. FREIMUTH:  No.  And I don't believe -- no.

8    Dr. Bauer will use the information for this litigation,

9    meaning the case we're on the phone discussing now.

10              THE COURT:  All right.  Is there anything to

11    say about this ethical argument that I might be setting up

12    plaintiff's outside counsel to at least have challenges to

13    fulfill their obligations to their client?

14              MR. FREIMUTH:  I think, as outside counsel, this

15    is an issue we confront all the time, and we're all capable

16    of sort of summarizing and discussing issues and information

17    with our clients without disclosing specific, competitively

18    sensitive business information that has been produced in the

19    case, particularly with the benefit of inside from outside

20    experts.

21              THE COURT:  All right.  Thank you very much.

22              Mr. Carlson, you can go ahead.

23              MR. CARLSON:  Thank you, Your Honor.

24              The only thing I was going to say is that we

25    will concede Mr. Rubin is a competitive decisionmaker.  But

1    we do still believe that there are others at Belcher

2    that would be able to assist outside counsel who are not

3    competitive decision-making.

4                    THE COURT:  Okay.  Great.  Thank you very much.

5            So thank you for the helpful argument.

6            As I see it, the first issue is whether there

7    should be a one-tier or two-tier structure here protecting

8    confidential and highly confidential material; and then the

9    second issue is whether Dr. Bauer should be permitted to

10   see some or all of that material; and then I think there is

11   a third issue.

12           But on the first issue, the protective order

13   I'm going to sign should have a two-tier confidentiality

14   structure.  It may turn out to be that very little falls

15   into the first tier, that is the merely confidential

16   information, but I can't say at this point that there will

17   be nothing in that first tier.  And so I think it is helpful

18   and appropriate to have the two tiers, and, of course, the

19   parties have to do their best in good faith to designate

20   things appropriately.  If it's only confidential, then it

21   should go into the first tier, and if it is truly highly

22   confidential, then it can go into the second tier.

23           The next issue is, I hereby find that Dr. Bauer

24   is going to be permitted to have access to both tiers of

25   information.  And by that, what I mean to say is the

plaintiffs have not persuaded me that he is an inappropriate

person to have access to both the confidential and the

highly confidential information.

    To the extent the plaintiff's argument turns on

the I think undisputed fact that Dr. Bauer is technically

employed by Pfizer, which is not a party to this litigation,

as opposed to being technically an employee of Hospira, a

subsidiary now of Pfizer and Hospira itself as the party

here, I am just not seeing much relevance to that fact to

the issue before me.

    I'm not seeing any basis to conclude that the

party who is employing Dr. Bauer is somehow increasing the

risk that Dr. Bauer, once he signs this, he'll be obligated

to do the obligation to comply with the protections of the

protective order, that somehow the risk of him breaching

those obligations is materially greater because he is

nominally employed by Pfizer as opposed to Hospira.  And I

am confident that the parties can revise the language of the

protective order to the extent necessary to make sure that

the definition of party or of any other definitions here

doesn't render Dr. Bauer ineligible out of the box.

    I can see a theoretical argument that even if

the risk of a breach is the same when Dr. Bauer is employed

by Pfizer as it is were he employed still by Hospira, that

somehow the magnitude of the damage that is likely to occur

is materially greater now that he works for a larger parent conglomerate instead of the subsidiary to this litigation.

Theoretically, that concept has some logic to it.  But there is no record here, no evidence and no reason comes to mind as to why I should think that in this case that is a real risk or something that should cause me to say Dr. Bauer is not appropriate to receive highly confidential information.

Notably, Dr. Bauer has been through this before. He signed on to other protective orders.  There is just no reason to expect that he is going to breach his obligations, and there is nothing that has been proven that would suggest that given his obligations in the company, that the human fact that he won't be able to necessarily put things out of his mind is somehow creating a risk that is likely to damage Belcher.

That is a long way of saying it hasn't been proven to me that he is a competitive decisionmaker.  So I just am not seeing the plaintiff meeting their burden to preclude Dr. Bauer from having the full access that Hospira seeks.

The third sort of issue as I see it is, well, what does all of this mean to Belcher?  I am not persuaded by the ethical arguments, but I do think that it would be better for this case if there is someone at Belcher that can

1    see not only the confidential information but also the

2    highly confidential information.

3              It is not Mr. Rubin, who is concededly a

4    competitive decisionmaker and more particularly is involved

5    in, if not running, R&D for Belcher.  And there, I think the

6    risk is too great, a risk based on inadvertence.  I'm not

7    suggesting Mr. Rubin would intentionally violate obligations

8    he would have to undertake pursuant to the protective order,

9    but the fact that I don't think that he could put out of

10   his mind the highly confidential research and development

11   information he would have access to from Hospira when he is

12   making decisions and doing and overseeing research that is

13   competitive with Hospira on behalf of Belcher is too great

14   of a risk and, therefore, not one that I am going to permit.

15             But I am open to and indeed hopeful that Belcher

16   will be able to identify somebody in-house who doesn't pose

17   quite those same risks to whom -- continuing to be helpful

18   to whom Hospira will agree can see both tiers of information.

19   And to the extent Hospira does not agree, then you will all

20   be back in front of me and I'll have to make a decision

21   based on whatever the record is at that point.

22             So to be as clear as I can, nothing I'm saying

23   today is meant to preclude the plaintiff from having an

24   opportunity to try to identify someone who can serve the

25   role in-house of reviewing confidential and highly

1    confidential information.

2            All that said, I do want to sign a protective

3    order consistent with what I have said.  So I would like to

4    get a new version from you all without adversely impacting

5    anybody's holiday plans.  So I will ask you if you have any

6    questions and what your proposed time frame would be for

7    getting me a new submission.  First, Mr. Freimuth.

8            MR. FREIMUTH:  I don't have any questions, Your

9    Honor, with respect to your ruling.  I would think with

10   respect to timing, we could submit something, I think the

11   substantial completion of document production is January

12   11th.  We could try to submit something to the Court before

13   then.

14           THE COURT:  That would certainly be fine by me

15   but, Mr. Carlson, any questions and what do you think of

16   submitting a new version no later than January 11?

17           MR. CARLSON:  My only question is, I guess it's

18   more of a comment, is that Belcher would request that the

19   individual that puts forward the acceptance by Hospira not

20   be unreasonably withheld.  I'm sure we can throw that

21   information in the protective order; but otherwise, January

22   11th I believe will be fine with us.

23           THE COURT:  Okay.  Certainly, the acceptance

24   should not be unreasonably withheld.  If you all want to put

25   that language in a protective order, that's fine.  If you

1    don't, that is my view of it, and that is the approach I

2    will take if a dispute comes back to me.

3              Anything else, Mr. Freimuth?

4              MR. FREIMUTH:  No, Your Honor.

5              THE COURT:  And Mr. Carlson, anything else?

6              MR. CARLSON:  No, Your Honor.

7              THE COURT:  Okay.  Thank you all very much.

8    Happy Holidays.  Good-bye.

9              (Telephone conference ends at 11:54 a.m.)

10

11        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

12

13                        /s/ Brian P. Gaffigan
                        Official Court Reporter
14                        U.S. District Court

15

16

17

18

19

20

21

22

23

24

25